UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
FOREST GUARDIANS )
312 Montezuma Ave. )
Santa Fe, NM 87501,  ) Civ. No.
 )
BOULDER REGIONAL GROUP )
P.O. Box # 1455 )
Boulder, Utah 84716 )
 )
and )
 )
CENTER FOR NATIVE ECOSYSTEMS, )
1536 Wynkoop, Suite 301 )
Denver, CO 80202, )
 )
       Plaintiffs, )
 )
v. )
 )
GALE NORTON )
Secretary of the Interior )
1849 C Street, N.W. )
Washington, D.C. 20240 )
 )
 )
       Defendant. )
 )

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

I. INTRODUCTION

1.    Plaintiffs FOREST GUARDIANS, BOULDER REGIONAL GROUP, and CENTER FOR NATIVE ECOSYSTEMS challenge the failure of the Secretary of the Interior, GALE NORTON, [hereinafter Fish and Wildlife Service or "FWS"] to perform mandatory duties required by section 4(b)(3)(A) of the Endangered Species Act ("ESA"), 16 U.S.C. §

1

1533(b)(3)(A), concerning the Plaintiffs' petition to reclassify the Utah Prairie Dog (*Cynomys parvidens*) from a threatened species to an endangered species. Defendant has violated her mandatory duty under the ESA to make a preliminary finding as to whether Plaintiffs' petition to reclassify the Utah Prairie Dog as an endangered species under the ESA presents substantial scientific or commercial information indicating that the petitioned action may be warranted. See 16 U.S.C. § 1533(b)(3)(A).

## II. PARTIES

2.     Plaintiff FOREST GUARDIANS is a non-profit environmental organization committed to protecting flora, fauna, natural processes, and native habitats in the greater American Southwest, including Utah. Forest Guardians works to promote the conservation of species that face high levels of imperilment, especially those species, like the Utah Prairie Dog, that play keystone roles in maintaining ecosystem vitality. Forest Guardians prepared the petition requesting that the FWS reclassify the Utah Prairie Dog as an endangered species under the ESA. Forest Guardians, its staff, and members derive scientific, aesthetic, and spiritual benefit from the Utah Prairie Dog's existence in the wild and from the ecosystem which the Utah Prairie Dog creates and sustains. Forest Guardians' staff and members regularly recreate in the habitat of the Utah Prairie Dog. Forest Guardians, its staff and members will continue to do the above described activities in the future on a regular basis.

Plaintiff BOULDER REGIONAL GROUP, founded in 1983, is a non-profit public lands environmental advocacy organization committed to a human ecological approach to protecting flora, fauna, natural processes, and native habitats primarily located in the Escalante Canyons Bioregion of southern Utah. Boulder Regional Group also works to promote the conservation of

imperiled species and their habitats in other areas of southern Utah, especially those species who perform keystone roles in maintaining healthy ecosystems such as the Utah Prairie Dog. Boulder Regional Group has participated in petitioning FWS in recent years to reclassify the Utah Prairie Dog as an endangered species under the ESA. Boulder Regional Group members derive scientific, and aesthetic benefit from the existence of wild and naturally maintained communities of Utah Prairie Dog's and are particularly concerned about effects to the entire ecosystem resulting from the continued low numbers of Utah Prairie Dogs due to the past down-listing of Utah Prairie Dog's to a threatened species by FWS. Boulder Regional Group staff and members have regularly visited and recreated in the various habitat areas of the Utah Prairie Dog in southern Utah for more than twenty-five years. BRG will continue to be involved in the above described activities in the future on a regular basis.

Plaintiff CENTER FOR NATIVE ECOSYSTEM is a Denver, Colorado-based non-profit, science-based conservation organization dedicated to protecting and recovering native and naturally functioning ecosystems in the Rocky Mountain Region, which includes the area within the range or potential range of the Utah Prairie Dog. Center for Native Ecosystems' staff and members regularly recreate in the habitat of the Utah Prairie Dog. Center for Native Ecosystems, its staff and members will continue to do the above described activities in the future on a regular basis.

3.   The above described educational, scientific, aesthetic, recreational, spiritual, procedural and conservation interests of Forest Guardians, Boulder Regional Group and Center for Native Ecosystems, their staff and members, have been, are being, and unless this Court grants the requested relief, will continue to be adversely affected and irreparably injured by Defendant's inaction.

4. Defendant GALE NORTON is sued in her official capacity as the Secretary of the Interior ("Secretary"). The Secretary is the federal official who bears ultimate responsibility for implementation of the ESA, including making determinations on petitions to reclassify species pursuant to ESA § 4(b)(3)(A).

### III. JURISDICTION, VENUE, AND NOTICE

5. This is an ESA citizen suit in which Plaintiffs allege that Defendant, who is a federal officer, violated a mandatory duty under Section 4 of the ESA. Thus, this Court has jurisdiction over this matter pursuant to 16 U.S.C. § 1540(g) (citizen suits under the ESA) and 28 U.S.C. § 1331.

6. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201 (declaratory judgments).

7. A substantial part of the alleged events and omissions giving rise to the claims in this case as well as the alleged violations of the mandatory duties occurred in the District of Columbia. Furthermore, Defendant Gale Norton officially resides in the District of Columbia. Thus, venue is proper in this Court pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e)(1) and (2).

8. By letter dated February 2, 2004, Plaintiffs provided Defendant with a letter which contained written notice of Plaintiffs' intent to sue for Defendant' failure to issue a substantial information finding on the Utah Prairie Dog reclassification petition. Plaintiffs provided Defendant with this notice of intent to sue letter pursuant to 16 U.S.C. § 1540(g)(2)(C). More than sixty (60) days have passed since Defendant received this written notice of intent to sue.

## IV. FACTS

### A. REGULATORY STRUCTURE

9.      The Endangered Species Act, 16 U.S.C. §§ 1531-1544 (ESA) seeks "to provide a program for the conservation of . . . endangered species and threatened species." 16 U.S.C. § 1531(b).

10.     Under the ESA, "endangered species" are those species that are determined by the Secretary of the Interior to be "in danger of extinction throughout all or a significant portion of [their] range," 16 U.S.C. § 1532(6), while the lesser classification of "threatened species" applies to those species determined by the Secretary of the Interior to be "likely to become an endangered species within the foreseeable future throughout all or a significant portion of [their] range." 16 U.S.C. § 1532(20).

11.     While the ESA provides a measure of protection to threatened species, it extends a substantially greater degree of protection to species listed as endangered. For example, the ESA makes it unlawful to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a member of an endangered species. 16 U.S.C. §§ 1538(a)(1)(B), 1532(19). This prohibition on what the ESA calls a "take" of a listed animal applies automatically to all endangered species, but only applies to a threatened species if the Secretary of the Interior specifically chooses to extend this protection to the members of that threatened species. See 16 U.S.C. § 1533(d).

12.     Regardless of whether a species is ultimately classified as endangered or merely threatened, the process of listing species under these categories is itself an essential component of the ESA's conservation program, as the protections contained in the ESA apply only to those species that are listed as endangered or threatened.

13.     To achieve its conservation goals, the ESA provides that interested persons can begin the listing process by filing a petition with FWS to list a species as endangered or threatened. 16 U.S.C. § 1533(b)(3)(A) (ESA § 4(b)(3)(A)).

14.     Upon receipt of such a petition to list a species, FWS must review the petition and within 90 days, "to the maximum extent practicable," make a finding as to whether that petition presents "substantial information" indicating that the petitioned action may be warranted. 16 U.S.C. § 1533(b)(3)(A).

15.     Although here Plaintiffs petitioned FWS to reclassify the Utah Prairie Dog from a threatened species to an endangered species, FWS's regulations implementing ESA § 4(b)(3)(A) treat petitions to reclassify a listed species the same as petitions to list a species. See 50 C.F.R. § 424.14(b)(1) (applying the 90-day deadline for substantial information findings to petitions to list, de-list, or reclassify a species under the ESA). Thus, the 90-day deadline for the substantial information finding applies to Plaintiffs' petition to reclassify the Utah Prairie Dog.

16.     In the event that FWS's substantial information finding is affirmative, that is that the petition does present substantial information that a listing rule may be warranted, FWS must issue a second finding, commonly referred to as the "12-month finding," within 12 months of the date of receipt of the petition. 16 U.S.C. § 1533(b)(3)(B). In the 12-month finding FWS must reach one of three possible conclusions: that (1) the petitioned action is warranted; (2) the petitioned action is warranted but presently precluded by other pending proposals for listing species; or (3) the petitioned action is not warranted. Id. As with the substantial information finding, FWS regulations treat reclassification petitions the same as listing petitions for the purposes of the 12-month finding. See 50 C.F.R. § 424.14(b)(3) (applying the 12-month deadline to petitions to list, de-list, or reclassify a species under the ESA).

17.     Although the ESA recognizes that it will not always be possible for FWS to complete the substantial information finding within ninety days, 16 U.S.C. § 1533(b)(3)(A), the statute clearly sets a maximum limit on the amount of time that FWS can take to make this substantial information finding.  The deadline for the 12-month finding is twelve months from the date that the petition was received, without exception.  See 16 U.S.C. § 1533(b)(3)(B).  Thus, FWS must complete the substantial information finding for a listing, de-listing, or reclassification petition within one year of receiving that petition, as the substantial information finding is a prerequisite step in the 12-month finding process.  See American Lands Alliance v. Norton, 242 F.Supp.2d 1, 8, ftnt. 7 (D.D.C. 2003) (citing Biological Diversity Foundation v. Babbitt, 63 F.Supp.2d 31 (D.D.C. 1999)).  See also Biodiversity Legal Foundation v. Badgley, 309 F.3d 1166, 1178 (9th Cir. 2002).

18.     FWS's violation of its duty to make a substantial information finding within 12 months can have several consequences.  For example, since the enactment of the ESA in 1973, 108 U.S. species are known to have become extinct.  Delays in the ESA listing process have contributed to the irreversible loss of 83 out of these 108 species.

B. THE UTAH PRAIRIE DOG LISTING PETITION

19.     The Utah Prairie Dog is one of five species of prairie dog found in North America. Slightly over one foot in length from head to tail and cinnamon to clay in color, Utah Prairie Dogs are social, colonial animals that have historically inhabited grasslands in the southwestern quarter of Utah.  Over the past century, however, Utah Prairie Dogs have disappeared from more than 98% of their historic range, and where they remain today they are significantly fewer in number than they were 100 years ago.

7

20.    As with other members of the prairie dog genus, Utah Prairie Dogs are a keystone species. Keystone species are species that create their own unique ecosystems.

21.    Utah Prairie Dogs serve as prey for a variety of other animals. Further, their large and complex burrow networks create refuge for a multitude of associated mammals, birds, reptiles, and insects, and their clipping, grazing, and other activities above ground alter soil and plant characteristics to create unique habitat for other species.

22.    Researchers have concluded that Prairie Dog colonies provide a habitat that is capable of supporting a level of biological diversity markedly higher than surrounding grassland areas that are uninhabited by prairie dogs. Research also indicates that nine species of birds and mammals are dependent upon prairie dogs for their own survival. Moreover, research demonstrates that about 140 wildlife species are associated, to varying degrees, with prairie dogs and their colonies.

23.    Despite these beneficial qualities, Utah Prairie Dogs are increasingly beset by a variety of human-induced threats to their continued existence. As a result, the total population of Utah Prairie Dogs has declined from its historic level of roughly 95,000 to 8,902 adults as of 2005.

24.    As their numbers have declined, Utah Prairie Dogs have also disappeared from the vast majority of their historic range. Though Utah Prairie Dog colonies once extended across 448,000 acres, by the time Plaintiffs submitted their petition to reclassify the Utah Prairie Dog, the occupied range of the species had shrunk to less than 7,000 acres.

25.    In recognition of the Utah Prairie Dog's imperiled existence, it was listed as an endangered species in 1973. See 38 Fed. Reg. 14,678 (June 4, 1973).

26.    However, in response to a petition from the State of Utah to remove the Utah Prairie Dog from the list of endangered species, FWS in 1984 decided to change the status of the Utah Prairie

Dog from an endangered species to a threatened species.  See 49 Fed. Reg. 22,330 (May 29, 1984).

27. Since being downgraded to a threatened species, the Utah Prairie Dog has slid closer to extinction.  While there is some degree of flux in Utah Prairie Dog populations, it is clear that those colonies that are doing well are not flourishing to an extent that can offset the severe decline observed in other locations.

28. As the Utah Prairie Dog is not currently listed as an endangered species, and thus is not subject to the ESA's mandatory "take" prohibition, FWS regulations permit the take of up to 6,000 Utah Prairie Dogs annually.  50 C.F.R. § 17.40(g).  Thus, under the current regulatory scheme, it is legal to drive the Utah Prairie Dog extinct.  Through 2002, more than 17,000 Utah Prairie Dogs had been "taken" pursuant to this rule, with the majority of these animals being shot.  The "taking" of Utah Prairie Dogs through this program inhibits the ability of the species to recover.

29. In 1991, FWS adopted a recovery plan for the Utah Prairie Dog.  However, instead of adopting policies that allow healthy colonies to remain in the locations where they have been able to succeed, the recovery plan places its primary emphasis on the relocation of existing Utah Prairie Dog colonies.  Such relocation efforts have a long history of failure.  The majority of the more than 20,000 Utah Prairie Dogs relocated between 1972 and 2002 perished soon after being transplanted.  As a result of its disastrous focus on relocation of Utah Prairie Dogs to what is often inadequate habitat, the 1991 recovery plan has also contributed to the continued decline of the species.

30. Even those Utah Prairie Dogs not subjected to relocation programs face significant dangers.  For example, livestock grazing in and around their colonies degrades the quality of the

9

Utah Prairie Dog's habitat. Grazing fosters the proliferation of shrubs and noxious weeds which replace the native grasses that make up the Utah Prairie Dog's food supply, leaving those areas unable to support Utah Prairie Dog populations.

31. Utah Prairie Dogs also face a significant threat of extinction from disease. Introduced to this country from Japan around the turn of the last century, sylvatic plague first reached the region occupied by Utah Prairie Dogs in 1936. Although Utah Prairie Dogs themselves do not carry the plague, their complete lack of natural immunity results in mortality rates of 99 – 100% among afflicted animals. Sylvatic plague outbreaks have continued to decimate Utah Prairie Dog populations in recent years, and the disease remains an active threat to the continued existence of the species.

32. While sylvatic plague alone could ultimately drive the Utah Prairie Dog to extinction, the plague in concert with habitat destruction, permitted shooting, and the unsuccessful relocation program has the potential to entirely eliminate the few populations that remain in existence.

33. Because the Utah Prairie Dog's status as a threatened species under the ESA does not provide sufficient protection to allow the species to avoid extinction, Plaintiffs Forest Guardians, Boulder Regional Group, and Center for Native Ecosystems among others, submitted a petition to reclassify the Utah Prairie Dog as an endangered species on February 3, 2003. Defendant received this petition to reclassify the Utah Prairie Dog by February 10, 2003, more than one year ago.

## V. CLAIMS

### FIRST CLAIM FOR RELIEF

(ESA Section 4(b)(3)(A))

34. Each allegation set forth in the Complaint is incorporated herein by reference.

35. It has been more than a year since Defendant received the petition to reclassify the Utah Prairie Dog. However, Defendant has failed to make a substantial information finding on the Utah Prairie Dog reclassification petition.

36. Therefore, Defendant is in violation of her mandatory duty under section 4(b)(3)(A) of the ESA by failing to make this substantial information finding. 16 U.S.C. § 1533(b)(3)(A).

37. Defendant's violation of the ESA constitutes agency action unlawfully withheld or unreasonably delayed under the Administrative Procedure Act. See 5 U.S.C. § 706(1).

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment providing the following relief:

A. Declare that Defendant is in violation of the ESA and/or the Administrative Procedure Act by failing to make a mandatory substantial information finding as to the Utah Prairie Dog reclassification petition;

B. Order Defendant through an injunction to make a substantial information finding as to the Utah Prairie Dog reclassification petition by a date certain;

C.      Award Plaintiffs costs, including reasonable attorneys' and expert witness fees; see 16 U.S.C. § 1540(g)(4); and

D.      Provide such other and further relief as the Court deems just and proper.

                                            Respectfully submitted,

                                            _____
                                            Robert Ukeiley (MD14062)
                                            Law Office of Robert Ukeiley
                                            433 Chestnut Street
                                            Berea, KY 40403
                                            Tel: (859) 986-5402
                                            Fax: (859) 986-1299
                                            E-mail: rukeiley@igc.org

                                            Counsel for Plaintiffs

Dated: February 2, 2006